# 16-3303-cv(L), 16-3304-cv(CON)

## United States Court of Appeals

*for the*

## Second Circuit

PETERSEN ENERGÍA INVERSORA S.A.U. AND
PETERSEN ENERGÍA, S.A.U.,
PLAINTIFFS-APPELLEES,

– v. –

ARGENTINE REPUBLIC AND YPF S.A.,
DEFENDANTS-APPELLANTS.

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF NEW YORK

**DEFENDANT-APPELLANT ARGENTINE REPUBLIC'S PETITION FOR
PANEL REHEARING AND REHEARING *EN BANC***

Maura Barry Grinalds
Jonathan J. Lerner
Boris Bershteyn
Shaud G. Tavakoli
SKADDEN, ARPS, SLATE,
    MEAGHER & FLOM LLP
Four Times Square
New York, New York 10036
(212) 735-3000

*Counsel for Defendant-Appellant
Argentine Republic*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES...................................................................... ii

INTRODUCTION AND RULE 35(b) STATEMENT................................................1

STATEMENT OF THE CASE..................................................................5

ARGUMENT ...........................................................................7

THIS APPEAL WARRANTS REHEARING AND REHEARING *EN BANC*.........7

I.    THE PANEL'S DECISION THREATENS BEDROCK
RECIPROCAL PRINCIPLES OF COMITY EMBODIED IN THE
FSIA...........................................................................7

II.    THE PANEL'S DECISION CONFLICTS WITH SUPREME COURT
PRECEDENT, *GARB* AND *RONG* IN HOLDING THE
PLAINTIFFS' CLAIMS ARE "BASED ON" COMMERCIAL
CONDUCT ...........................................................................8

    A.    The Panel Incorrectly Divorced the Tender Offer Requirement
from the Expropriation, the Gravamen of Plaintiffs' Claims...............8

    B.    Even if the Expropriation "Triggered" a Tender Offer
Obligation, that Consequence Directly Flows from the
Expropriation, Not Commercial Activity ...........................................13

    C.    The Bylaws Preclude Any Back-End Tender Offer Obligation
After a Takeover ...........................................................................15

III.    THE PANEL FAILED TO PROPERLY CONSIDER EXPERT
TESTIMONY AND OVERLOOKED OTHER EVIDENCE.......................16

CONCLUSION...........................................................................18

CERTIFICATE OF COMPLIANCE ..................................................................19

# TABLE OF AUTHORITIES

## CASES

*Anglo-Iberia Underwriting Management Co. v. P.T. Jamsostek (Persero),*
600 F.3d 171 (2d Cir. 2010).................................................................9, 12

*Animal Science Products, Inc. v. Hebei Welcome Pharmaceutical Co.,*
138 S. Ct. 1865 (2018)........................................................................4, 16

*Bolivarian Republic of Venezuela v. Helmerich & Payne International*
*Drilling Co.,*
137 S. Ct. 1312 (2017)................................................................2, 3, 7, 14

*Collins v. Harrison-Bode,*
303 F.3d 429 (2d Cir. 2002)........................................................................12

*Cruden v. Bank of New York,*
957 F.2d 961 (2d Cir. 1992)........................................................................10

*De Letelier v. Republic of Chile,*
748 F.2d 790 (2d Cir. 1984)........................................................................13

*Garb v. Republic of Poland,*
440 F.3d 579 (2d Cir. 2006)................................................................passim

*Garb v. Republic of Poland,*
207 F. Supp. 2d 16 (E.D.N.Y. 2002)....................................................13, 15

*Guevara v. Republic of Peru,*
468 F.3d 1289 (11th Cir. 2006)........................................................................15

*Katel Ltd. Liability Co. v. AT & T Corp.,*
607 F.3d 60 (2d Cir. 2010)........................................................................11

*Millen Industries Inc. v. Coordination Council for North American Affairs,*
855 F.2d 879 (D.C. Cir. 1988) ........................................................................13

*OBB Personenverkehr AG v. Sachs,*
136 S. Ct. 390 (2015)................................................................2, 8, 9, 13, 17

*Rong v. Liaoning Province Government,*
452 F.3d 883 (D.C. Cir. 2006) ........................................................3, 14, 15

*Saudi Arabia v. Nelson*,
    507 U.S. 349 (1993)................................................................2, 8

*Vera v. Republic of Cuba*,
    867 F.3d 310 (2d Cir. 2017)...............................................8

**STATUTES**

28 U.S.C. § 1604 ................................................................................7

28 U.S.C. § 1605(a)(2)...................................................................6, 7

**OTHER AUTHORITIES**

BLACK'S LAW DICTIONARY (10th ed. 2014) ..................................................10

## INTRODUCTION AND RULE 35(b) STATEMENT

This is an exceptionally important case concerning the jurisdiction of U.S. courts over claims against foreign sovereigns under the Foreign Sovereign Immunities Act ("FSIA"), with significant implications for foreign relations and international comity.

The Panel misapplied the "commercial activity" exception to foreign sovereign immunity in the context of the expropriation by Defendant-Appellant the Argentine Republic ("Argentina") of a controlling stake in its largest oil and gas company, YPF S.A. ("YPF").

The gravamen of Plaintiffs-Appellees Petersen Energía Inversora S.A.U. and Petersen Energía, S.A.U.'s (together, "Petersen" or "Plaintiffs") claim—the act that caused their alleged injury—was indisputably Argentina's seizure of control of YPF through a formal act of expropriation without a prior tender offer under YPF's bylaws (the "Bylaws"). While Argentina did not expropriate Petersen's holdings, Plaintiffs allege that the expropriation of other shares (for which Argentina paid approximately $5 billion) had to be accompanied by a tender offer for Petersen's shares.

The assertion of jurisdiction over conduct intertwined with the quintessentially sovereign act of expropriation is unprecedented in this Circuit, conflicts with decisions of other Circuits, will have far-reaching consequences for

international comity, and could adversely affect a sovereign state's efforts to address public economic and social crises within its own borders.

First, the Panel's decision (the "Decision") contravenes this Court's decision in *Garb v. Republic of Poland*, 440 F.3d 579 (2d Cir. 2006), which recognized that "[e]xpropriation is a decidedly sovereign—rather than commercial—activity," *id.* at 586, and held that

> when a claim is based on what is 'in substance a taking of property . . . it should be considered <u>only</u> under the takings exception of section 1605(a)(3). To hold otherwise would be to allow plaintiffs to escape the requirements of section 1605(a)(3) through artful recharacterization of their takings claims.'

*Id.* at 588 (alteration and emphasis in original).[1] By allowing Petersen to recast its challenge to the expropriation as a "commercial" violation of the Bylaws, the Panel improperly credited "artful pleading," contrary to the express admonitions in *Garb* and *OBB Personenverkehr AG v. Sachs*, 136 S. Ct. 390, 396-97 (2015) (precluding plaintiff from "recast[ing]" its complaint to "thwart[] the [FSIA's] manifest purpose") (first alteration in original) (quoting *Saudi Arabia v. Nelson*, 507 U.S. 349, 363 (1993)).

Second, as the Supreme Court recently reaffirmed in *Bolivarian Republic of Venezuela v. Helmerich & Payne International Drilling Co.*, 137 S. Ct. 1312

---

[1] Unless indicated, all emphasis in quotations and case citations has been added and citations have been omitted.

2

(2017), the limited commercial activity exception confers jurisdiction only in "cases 'arising out of a foreign state's <u>strictly commercial acts</u>.'" *Id.* at 1315.

The Panel, by contrast, extended the "commercial activity" exception to commercial consequences <u>directly flowing from and inextricably intertwined with an expropriation</u>. The exception does not reach that far. As this Court held in *Garb*, "subsequent commercial transactions involving expropriated property do not give rise to subject matter jurisdiction over claims arising from the original expropriation." 440 F.3d at 587; *accord Rong v. Liaoning Province Gov't*, 452 F.3d 883, 889-91 (D.C. Cir. 2006) (holding that subsequent acts and legal consequences related to expropriated property—even of a commercial character—do not implicate commercial activity exception because "these acts all flow" from expropriation).

Third, the Panel incorrectly stated that the tender offer should be made <u>after</u> the expropriation, ignoring and, worse, contradicting not only the Bylaws and the YPF prospectus, but also Petersen's complaint and the parties' expert submissions, which <u>uniformly</u> recognized that the tender offer was required <u>in order</u> to obtain control.

As the YPF prospectus quoted in Petersen's complaint unambiguously explained:

> Under the Company's By-Laws, <u>in order to acquire</u> a majority of the Company's capital stock or a majority of the Class D Shares, the

3

Argentine Government <u>first would be required to make a cash tender offer to all holders</u> of Class D Shares on [specified] terms.

(A.23; *see also* A.410 (Bylaw Section 7(e) ("The person <u>wishing</u> to [effect] a

Takeover . . . shall: . . . <u>Arrange a takeover bid for the acquisition of all the shares</u> .

. . of the Corporation [*i.e.*, a tender offer for all shares].")).)

Nonetheless, the Panel held that the Bylaws "suggested" that Argentina

assumed an independent contractual obligation—only <u>after</u> the expropriation—to

tender for YPF's remaining shares. Although the Panel stated it "divine[d]" this

interpretation from the Bylaws' text (Op. 23), it disregarded the unequivocal terms

of the Bylaws, which required a tender offer for "all shares" in "all acquisitions"

<u>before</u> Argentina acquired control (A.410, A.432), as well as uniform expert

testimony that under Argentine law the tender offer had to occur <u>before</u> a takeover

(*see, e.g.*, A.476 ("Argentina was obligated to make a tender offer . . . <u>before</u>

exercising [] control . . .").)

Fourth, in disregarding Argentina's submissions, duly supported by expert

evidence, on the conflict under Argentine law between the Bylaws and the

expropriation legislation (the "Expropriation Law"), the Panel misconstrued the

Supreme Court's recent decision in *Animal Science Products, Inc. v. Hebei

Welcome Pharmaceutical Co.*, 138 S. Ct. 1865 (2018), which requires that a federal

court accord "respectful consideration" to a foreign sovereign's statements

concerning its own laws. *Id.* at 1869.

Petersen's alleged injury manifestly arose from Argentina's act of expropriation—using powers available only to a sovereign—and not strictly from commercial conduct. Federal courts thus lack jurisdiction over Petersen's claims against Argentina. Proper and consistent application of foreign sovereign immunity is foundational to international comity and to the interests of the United States in reciprocal immunity before foreign courts. Absent rehearing or rehearing *en banc*, the Decision threatens to upend decades of settled jurisprudence protecting sovereign states—and the United States—from foreign scrutiny into their public acts.

## STATEMENT OF THE CASE

YPF was a state-owned enterprise until 1993, when it launched its initial public offering. (A.14.) As Petersen alleged, the company's Bylaws provide that, before re-acquiring a controlling stake in YPF, Argentina would make a tender offer for all shares, to all shareholders. (*Id.*)

Between 2008 and 2011, Petersen acquired over 25% of YPF's stock wholly financed by loans, primarily from Repsol YPF S.A. ("Repsol"). (A.24-25.) To ensure repayment, Repsol and Petersen agreed, as controlling YPF shareholders, to distribute as dividends at least 90% of YPF's profits and pay an "extraordinary dividend" of $850 million. (A.26.) This scheme prevented YPF from reinvesting profits to develop the country's reserves, exacerbating Argentina's dependence on

5

foreign energy sources.  (A.435-38.)

Consequently, through duly enacted laws, Argentina directed the immediate and temporary seizure of YPF and expropriation of exactly 51% of YPF's Class D shares held by Repsol, for a price determined by law.  (A.440, A.449-50.)  The Expropriation Law necessarily superseded the conflicting mandate in the Bylaws that Argentina make a tender offer for all shares before acquiring a controlling stake in YPF.

Petersen sued Argentina in the District Court for breaching the Bylaws by effectuating the expropriation without a tender offer.  As a foreign sovereign presumptively immune from jurisdiction under the FSIA, Argentina moved to dismiss.  Petersen invoked jurisdiction under the "commercial activity" exception to the FSIA, 28 U.S.C. § 1605(a)(2).

The District Court denied Argentina's motion, holding that the expropriation of a majority stake in YPF triggered a purportedly separate commercial obligation to tender for all remaining shares.  (SA.16; Op. 22, 25.)  Disregarding Argentina's experts who opined that the Expropriation Law preempted any such duty, the District Court declared "I actually don't really care what the experts say."  (A.538.)

On appeal, the Panel affirmed, deeming Argentina's failure to conduct the tender offer after the expropriation a purportedly independent breach of contract within the commercial activity exception.  (Op. 25.)

6

## ARGUMENT

## THIS APPEAL WARRANTS REHEARING
## AND REHEARING *EN BANC*

**I.     THE PANEL'S DECISION THREATENS BEDROCK RECIPROCAL PRINCIPLES OF COMITY EMBODIED IN THE FSIA**

The doctrine of sovereign immunity is "deeply rooted in the principles of sovereign consent and reciprocity—concepts that form the touchstones of international law." *Garb*, 440 F.3d at 585.

Under the FSIA, "a foreign state shall be immune from the jurisdiction of the courts of the United States and of the States" unless a statutorily specified exception applies. 28 U.S.C. § 1604. This mandate "recognizes the 'absolute independence of every sovereign authority' and helps to 'induc[e]' each nation state, as a matter of 'international comity,' to 'respect the independence and dignity of every other,' including our own." *Helmerich*, 137 S. Ct. at 1319 (alteration in original).

The narrow "commercial activity" exception to the FSIA applies to claims "based upon . . . an act outside [the U.S.] in connection with a commercial activity of the foreign state," which "causes a direct effect in the United States." 28 U.S.C. § 1605(a)(2).

Sovereign actions are "commercial" only "where [the sovereign] acts 'in the manner of a private player within' the market" and "exercises 'only those powers

that can also be exercised by private citizens,' as distinct from those powers peculiar to sovereigns." *Nelson*, 507 U.S. at 360.

The immunity U.S. courts must afford foreign sovereigns under the FSIA is a question of exceptional importance with significant implications for U.S. foreign policy. *See Vera v. Republic of Cuba*, 867 F.3d 310, 316 (2d Cir. 2017). These ramifications are heightened in this case, where exercise of jurisdiction over a foreign state's quintessentially sovereign act in seizing its largest oil company to avert an escalating domestic energy crisis and ensure national energy independence represents an unprecedented departure from well-settled FSIA jurisprudence.

## II. THE PANEL'S DECISION CONFLICTS WITH SUPREME COURT PRECEDENT, *GARB* AND *RONG* IN HOLDING THE PLAINTIFFS' CLAIMS ARE "BASED ON" COMMERCIAL CONDUCT

### A. The Panel Incorrectly Divorced the Tender Offer Requirement from the Expropriation, the Gravamen of Plaintiffs' Claims

The core of Petersen's suit, and the *sine qua non* of its alleged claims, is a sovereign act. The Panel erred in concluding that the gravamen of Petersen's alleged injury was not the expropriation.

To determine whether the commercial activity exception applies, a court must first "identify[] the particular conduct on which the [plaintiff's] action is 'based.'" *Nelson*, 507 U.S. at 356. In *Sachs*, the Supreme Court elaborated: "[A] court should identify . . . 'the "gravamen of the complaint"'" by "zero[ing] in on the core of [the] suit: the . . . sovereign acts that actually injured [the plaintiff]."

8

*Sachs*, 136 S. Ct. at 395-96. The Panel misapplied this standard.

Argentina's seizure of control of YPF through expropriation without launching a tender offer is the particular conduct on which Plaintiffs' action is founded—a uniquely sovereign act outside the "commercial activity" exception. *See Garb*, 440 F.3d at 586. Manifestly, expropriation is not the "type of action[] by which a private party engages in trade and traffic or commerce." *Anglo-Iberia Underwriting Mgmt. Co. v. P.T. Jamsostek (Persero)*, 600 F.3d 171, 177 (2d Cir. 2010).

The Panel erred when it severed Argentina's purported breach of the tender offer provisions from the expropriation to constitute a separate, distinct act that was "commercial in nature." (Op. 25.) Its reasoning relied on the erroneous premise that, "when Argentina expropriated Repsol's 51% stake in YPF, it incurred the obligation under section 28(A) of YPF's bylaws to make a tender offer for the remainder of YPF's outstanding shares." (*Id.*)

First, this premise disregarded the indisputable fact that the Expropriation Law declared only 51% of the equity of YPF "a public interest and subject to expropriation." (A.449.)

Second, the Panel ignored the unequivocal text of the Bylaws, which require a tender offer for all shares (not just the "remainder" (Op. 22)) in "all acquisitions" resulting in control. The Bylaws nowhere provide for a tender offer for any

9

remainder; they require the acquisition of <u>all</u> shares at the <u>same</u> price under <u>one</u> tender offer.  (A.410, A.413.)  The Panel also <u>rewrote</u> Section 28, which unambiguously provides that the Bylaws' tender offer provisions "shall apply to <u>all</u> <u>acquisitions</u> … <u>of shares</u>" by Argentina resulting in control.  (A.432.)  To exempt Argentina's <u>initial</u> acquisition of control from the tender offer requirements, the Panel deleted the word "all" and substituted "Argentina's acquisition of YPF's shares" (Op. 24)—a type of "redraft" a court may not perform.  *See Cruden v. Bank of N.Y.*, 957 F.2d 961, 976 (2d Cir. 1992).

Third, the Decision ignored the Bylaws' unequivocal mandate that the tender offer <u>precede</u> a takeover.  Sections 7(e) and 7(f) of the Bylaws describe the tender offer requirements applicable to all investors (A.410-14), including Argentina (A.432-33).  Section 7(e), which the Panel did not address, provides that "[t]he person <u>wishing</u> to [effect] a <u>Takeover</u> . . . shall: . . . <u>Arrange a takeover bid for the</u> <u>acquisition of all the shares</u> of . . . the Corporation [*i.e.*, a tender offer]."  (A.410.)  By definition, "[w]ishing" refers to a <u>prospective</u> action: To "wish" is "[t]o desire; to hope."  BLACK'S LAW DICTIONARY (10th ed. 2014).  Hence, any investor seeking to conduct a "Takeover" must first make a tender offer.

Section 28(A) unequivocally requires that Argentina, like any other investor, conduct a tender offer for <u>all</u> shares <u>before</u> conducting a "Takeover."  Section 28(A) provides:

> The provisions [of Sections 7(e) and 7(f) requiring a tender offer for all shares]. . . shall apply to all acquisitions made by [Argentina] . . . of shares or securities of the Corporation, 1) if, as a consequence of such acquisition, [Argentina] becomes the owner, or exercises the control of, the shares of the Corporation, which . . . represent, in the aggregate, at least 49% of the capital stock[.]

(A.432.)

Despite these unambiguous provisions, the Panel seized upon the single word "forbidden" in Section 7(d), which sets lower thresholds to trigger a tender offer for private investors, to conjecture that its absence in Section 28 "suggests that Argentina's acquisition of a control position is different" and "did not have to be accomplished through a tender offer." (Op at 24-25.) But Section 28(D) explicitly provides that "[t]he term 'Takeover' used in section 7" (where the word "forbidden" appears) "is applied to the acquisitions provided for in [Section 28(A) applicable to Argentina]." (A.433.) Hence, Section 28 incorporates Section 7(d)'s prohibition against a Takeover without a prior tender offer for all shares. *See Katel Ltd. Liab. Co. v. AT & T Corp.*, 607 F.3d 60, 64 (2d Cir. 2010) (court "must 'give full meaning and effect to all [contractual] provisions'").

Any doubt that the Decision is fatally flawed is dispelled by Petersen's binding judicial admissions in its complaint and separate petition under the Argentine-Spain bilateral treaty that a tender offer must precede a Takeover. (*See* A.21 (Complaint: "Section 28 expressly prohibits Argentina from exercising control over the Company unless and until it has made a tender offer."); A.461

11

(Bilateral treaty petition: "[Argentina's] illegal actions included . . . confiscation of Repsol's controlling shareholding interest <u>without first complying</u> with the public tender provisions of the YPF's by-laws.").)  Petersen's own experts confirmed this sequence.  (*See* A.502 ("<u>Prior to takeover</u>, the acquirer is required to carry out a [tender offer]."); *accord* A.476 ("Argentina was obligated to make a tender offer . . . <u>before</u> exercising . . . control.").)  Despite quoting YPF's prospectus (Op. 6-7) (which Petersen's complaint also quoted), the Panel disregarded its unequivocal representation that:

> Under the Company's By-Laws, <u>in order to acquire</u> a majority of the Company's capital stock or a majority of the Class D Shares, <u>the Argentine Government first would be required to</u> make a cash tender offer to <u>all</u> holders of Class D Shares on [specified] terms.

(A.23.)

Even if the Panel found the Bylaws ambiguous (*see* Op. 23 (asserting the "bylaw is not a paragon of clarity")) despite their unequivocal terms, the Panel improperly construed them, as a matter of law, against Argentina when it was Petersen's burden to establish an exception to the FSIA.  *Anglo-Iberia*, 600 F.3d at 175.  At a minimum, the Panel should have remanded to permit discovery concerning the parties' intent.  *See Collins v. Harrison-Bode*, 303 F.3d 429, 434 (2d Cir. 2002).

12

**B.** **Even if the Expropriation "Triggered" a Tender Offer Obligation, that Consequence Directly Flows from the Expropriation, Not Commercial Activity**

Even if the Panel were correct that the expropriation caused a duty to make a tender offer, Petersen's claim would be too intertwined with the expropriation to trigger the "commercial activity" exception.

As this Court held in *Garb*:

> [W]hen a claim is based on what is 'in substance a taking of property . . . . it should be considered only under the takings exception of section 1605(a)(3). To hold otherwise would be to allow plaintiffs to escape the requirements of section 1605(a)(3) through artful recharacterization of their takings claims.

440 F.3d at 588 (second alteration in original); *accord Sachs*, 136 S. Ct. at 396. As Chief Judge Korman explained in *Garb v. Republic of Poland*, 207 F. Supp. 2d 16 (E.D.N.Y. 2002), "every expropriation of property has some commercial implications," *id.* at 32, and if those implications triggered the commercial activities exception, that would subsume the rule of sovereign immunity for expropriations. *Accord De Letelier v. Republic of Chile*, 748 F.2d 790, 796 (2d Cir. 1984) ("[C]ourts should not deem activity 'commercial' as a whole simply because certain aspects of it are commercial."); *see also Millen Indus. Inc. v. Coordination Council for N. Am. Affairs*, 855 F.2d 879, 885 (D.C. Cir. 1988) ("Even if a transaction is partly commercial, jurisdiction will not obtain if the cause of action is based on a sovereign activity.").

13

As *Garb* explicitly held, jurisdiction is inappropriate where, "regardless of the subsequent commercial treatment of the expropriated property, plaintiffs' claims are 'based upon' the acts of expropriation." 440 F.3d at 586. *A fortiori*, the immediate contractual consequences of an expropriation cannot be severed from the expropriation and characterized as independent commercial activity. As the Supreme Court recently re-affirmed, the limited commercial activity exception confers jurisdiction only in "cases 'arising out of a foreign state's <u>strictly commercial acts</u>[.]'" *Helmerich*, 137 S. Ct. at 1315.[2]

Following *Garb*, the D.C. Circuit in *Rong* reaffirmed that incidental and subsequent acts and legal consequences related to an expropriation, even commercial ones, are not subject to the commercial activity exception because "all of these acts flow" from the expropriation. 452 F.3d at 889.

In *Rong*, a Chinese province expropriated the plaintiff's shares in a company and months later transferred them to a newly formed entity at a below-market price. *Id.* at 886-87. The plaintiff argued that the share transfer constituted commercial activity. *Id.* at 888. The court disagreed, explaining that if the plaintiff

---

[2] The Panel misguidedly reasoned that the tender offer obligation "could just as easily have been triggered" by Argentina's "open market transactions." (Op. 26.) Every expropriation could "just as easily" be accomplished by a market purchase. Because Argentina obtained control using uniquely sovereign powers, it does not constitute commercial activity.

14

were correct, then "almost any subsequent disposition of expropriated property could allow the sovereign to be haled into a federal court under [the] FSIA," which would contravene the Act's purpose and precedent from other Circuits, including *Garb*. *Id.* at 890-91.

Here, as in *Garb* and *Rong*, Argentina's alleged breach is based on the taking of property, *see Garb*, 440 F.3d at 588, and, at best, a "commercial implication[]," *Garb*, 207 F. Supp. 2d at 32, flowing directly from the expropriation, *see Rong*, 452 F.3d at 890. As such, it is reviewable only under the FSIA takings exception, which Petersen assiduously avoided.[3]

## C. The Bylaws Preclude Any Back-End Tender Offer Obligation After a Takeover

Even if the expropriation freshly "triggered" a tender offer requirement (and it did not), Section 7(d) of the Bylaws directly forecloses any claim that, once in control, Argentina had a "new" obligation to tender for the remainder. As Petersen admits, "[t]he [Expropriation Law] . . . put Argentina in the shoes of Repsol as the majority shareholder of YPF, subject to all of the rights and obligations Repsol had under . . . the bylaws." (Opp'n 15; *accord* Opp'n 2.) However, the Bylaws

---

[3] The Panel hypothesized that a commercial contract could be conditioned "on the occurrence of a sovereign act." (Op. 26 (citing *Guevara v. Republic of Peru*, 468 F.3d 1289 (11th Cir. 2006)).) However, here the sovereign act itself caused and is inseparable from the alleged breach. The Panel cited no precedent finding jurisdiction over lawsuits to enforce obligations allegedly triggered by an expropriation.

15

expressly exempt a controlling shareholder from the tender offer requirements. (A.409-10.) Because Repsol, as controlling shareholder, was exempt from the tender offer provisions, so too was Argentina after stepping into Repsol's shoes. If, as it professes, Petersen does not challenge the expropriation, it cannot assert a breach of any commercial obligation.

## III. THE PANEL FAILED TO PROPERLY CONSIDER EXPERT TESTIMONY AND OVERLOOKED OTHER EVIDENCE

In *Animal Science*, the Supreme Court affirmed that, "[i]n the spirit of 'international comity,' a federal court should carefully consider a foreign state's views about the meaning of its own laws" and "accord respectful consideration" to them. 138 S. Ct. at 1869, 1873. The Panel failed to do so.

Purporting to apply *Animal Science*, the Panel declared that "there is . . . no statement in [Argentina's] expert's opinion that the [Expropriation Law] compelled Argentina to 'acquire exactly 51% ownership in YPF' and no greater ownership position." (Op. 28 (emphasis in original).) Yet, Argentina's expert submissions established that

> [t]he Republic cannot be bound by a private contractual agreement to acquire a higher number of shares than necessary in order to satisfy the public use as set forth in Law No. 26,741. The national Congress decided to declare for public use 51% of YPF shares, and no more than that percentage. . . . The intervention and expropriation process therefore excluded any procedure, such as the public tender offer described in YPF's bylaws, which would force the Republic to acquire a larger number of shares than necessary to achieve the purposes of the expropriation stated in the law.

16

(A.522-23.) The Panel gave no consideration, let alone "respectful consideration," to Argentina's experts on the meaning of Argentina's own laws. Indeed, even Plaintiffs' experts on Argentine law concurred that the obligation to tender preceded acquisition of control. (A.476; A.502.)

The Panel also erred in concluding that nothing in the record showed Argentina could not comply with both the Expropriation Law and the Bylaws. (Op. 27.) As Argentina's expert explained, the Bylaws' tender offer provisions are "incompatible with" the Expropriation Law and therefore "cannot be given effect." (A.522.) The Expropriation Law mandated that Argentina intervene to oust and replace YPF's management, seize Repsol's shares, and immediately assume voting rights of those shares (A.440, A.449, A.14)—acts Petersen concedes were precluded by the Bylaws (A.14, A.21-22, A.28, A.33; *see also* A.521, A.415, A.432). As the complaint demonstrates, these sovereign actions constituted the "gravamen" of Petersen's claim, *Sachs*, 136 S. Ct. at 396, because they terminated Petersen's dividend payment (A.29), "causing Petersen to default on its loan agreements with its creditors" (A.15).

The Panel also overlooked that the Expropriation Law explicitly required that (1) Argentina acquire shares only from Repsol, for a specified price (A.449-50), and (2) YPF remain a public company (A.450), mandates irreconcilable with the Bylaws' tender offer provisions requiring Argentina to acquire all YPF shares at

17

a predetermined price (A.412-13), which would necessarily result in YPF

becoming a non-public state-owned company.

## CONCLUSION

Argentina respectfully requests that the Court grant rehearing and rehearing

*en banc*.

Dated: New York, New York
    July 24, 2018

*/s/ Maura Barry Grinalds*
Maura Barry Grinalds
(MauraBarry.Grinalds@skadden.com)
Jonathan J. Lerner
(Jonathan.Lerner@skadden.com)
Boris Bershteyn
(Boris.Bershteyn@skadden.com)
Shaud G. Tavakoli
(Shaud.Tavakoli@skadden.com)
SKADDEN, ARPS, SLATE,
   MEAGHER & FLOM LLP
Four Times Square
New York, New York 10036
Telephone: (212) 735-3000

*Counsel for Defendant-Appellant*
*Argentine Republic*

18

## <u>CERTIFICATE OF COMPLIANCE</u>

1. This petition complies with the page limitation of Fed. R. App. P. 35(b)(2) and 40(b) because it contains 3,877 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

2. This petition complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because it been prepared in a proportionally spaced typeface using Microsoft Word in Times New Roman, 14 point.


Dated: New York, New York
   July 24, 2018      */s/ Maura Barry Grinalds*
               Maura Barry Grinalds

               *Counsel for Defendant-Appellant*
               *Argentine Republic*

**OPINIONS**

16-3303-cv(L)
*Petersen Energía Inversora, S.A.U., et al. v. Argentine Republic, et al.*

# UNITED STATES COURT OF APPEALS
## FOR THE SECOND CIRCUIT

---

August Term 2016

(Argued:  June 15, 2017   Decided:  July 10, 2018)

Docket Nos. 16-3303-cv(L), 16-3304-cv(Con)

---

PETERSEN ENERGÍA INVERSORA S.A.U. AND PETERSEN ENERGÍA, S.A.U.,

*Plaintiffs-Appellees*,

*v.*

ARGENTINE REPUBLIC AND YPF S.A.,

*Defendants-Appellants*.[*]

---

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

---

Before:

WINTER, CALABRESI, AND CHIN, *Circuit Judges*.

---

[*]     The Clerk of Court is directed to amend the official caption to conform to the above.

Appeal from an order of the United States District Court for the Southern District of New York (Preska, *J.*), denying defendants-appellants' motion to dismiss under (1) Federal Rule of Civil Procedure 12(b)(1) for lack of subject matter jurisdiction on grounds of foreign sovereign immunity and (2) Federal Rule of Civil Procedure 12(b)(6) pursuant to the act of state doctrine.

AFFIRMED IN PART AND DISMISSED IN PART.

Judge WINTER concurs in part and dissents in part in a separate opinion.

---

MICHAEL K. KELLOGG (Mark C. Hansen, Derek T. Ho, Benjamin S. Softness, *on the brief*), Kellogg, Hansen, Todd, Figel & Frederick, P.L.L.C., Washington, D.C., *and* Reginald R. Smith, King & Spalding LLP, New York, New York, *for Plaintiffs-Appellees*.

MAURA BARRY GRINALDS, Skadden, Arps, Slate, Meagher & Flom LLP, New York, New York, *and* Martin Domb, Benjamin Joelson, Ackerman LLP, New York, New York, *for Defendant-Appellant Argentine Republic*.

MICHAEL A. PASKIN, Cravath, Swaine & Moore LLP, New York, New York, *and* Thomas J. Hall, Marcelo M. Blackburn, Chadbourne & Parke LLP, New York, New York, *for Defendant-Appellant YPF S.A.*

---

2

CHIN, *Circuit Judge*:

Defendants-appellants the Argentine Republic ("Argentina") and YPF S.A. ("YPF") (together, "defendants") appeal an order of the United States District Court for the Southern District of New York (Preska, *J.*), denying defendants' motions to dismiss under (1) Federal Rule of Civil Procedure 12(b)(1) for lack of subject matter jurisdiction on grounds of foreign sovereign immunity and (2) Federal Rule of Civil Procedure 12(b)(6) pursuant to the act of state doctrine. We affirm the district court's order insofar as it denied the motion to dismiss under the Foreign Sovereign Immunity Act and we dismiss defendants' appeal as to the act of state doctrine.

## *BACKGROUND*

Unless otherwise noted, the facts herein are undisputed. They are drawn from the complaint and the documents submitted by the parties in reference to defendants' motions to dismiss.

## I. YPF Becomes a Publicly Traded Company

YPF is a petroleum company that was wholly owned and operated by the Argentine government until 1993. That year, in accordance with broader efforts to reform its economy, Argentina decided to privatize the petrol firm through an initial public offering ("IPO") of nearly 100% of YPF's voting stock

3

Case 16-3303, Document 141-1, 07/16/2018, 2341287, Page4 of 59

(the "shares").[1]  Argentina and YPF took a number of steps to entice investors to participate in the IPO and thereby ensure its success, two of which are particularly relevant to this case.  First, they arranged for YPF to offer shares in the United States as American Depository Receipts ("ADRs") listed on the New York Stock Exchange ("NYSE").  Second, they amended YPF's bylaws -- that is, the contract governing the relationship among YPF, Argentina (in its capacity as a shareholder), and other YPF shareholders.  In particular, the bylaws were amended to incorporate protections for investors from (1) hostile takeovers and (2) attempts by Argentina to renationalize the company.  These takeover protections form the basis of this breach of contract dispute, and so we describe them in some detail.

Section 7(d) of the amended bylaws prohibits (with certain exceptions inapplicable here) the direct or indirect acquisition of YPF shares if

---

[1]  Indeed, an article written by the then-Governor of the Central Bank of Argentina notes that "[t]he reforms of the 1990s . . . included financial system reforms, liberalization of trade and the capital account, and far-reaching public sector reforms," including "[p]ublic sector reform, which substantially reduced the scope of [Argentina's] public sector [and] entailed privatizing almost all of the major public enterprises" in the country.  Pedro Pou, *Argentina's Structural Reforms of the 1990s*, 37 Fin. & Dev. 13, 13 (2000).  Privatizing Argentina's major public enterprises had three main benefits:  "Public subsidies to [the formerly public] enterprises were reduced or eliminated; the enterprises' efficiency and provision of services improved dramatically; and funds became available to cover a substantial part of the government deficit while other reforms . . . were under way."  *Id.*

4

the acquisition results in the acquirer controlling 15% or more of the shares, unless the acquirer makes a tender offer for all of the outstanding shares in accordance with certain procedures and at a price determined by a formula in the bylaws.  Among the prescribed procedures, section 7(f) requires that any such tender offer comply with the rules and regulations imposed by the governments and stock exchanges where YPF's shares are listed.  Because YPF's securities were to be listed on the NYSE, those conducting tender offers in accordance with these shareholder protection measures would be compelled by section 7(f) to comply with NYSE and Securities and Exchange Commission ("SEC") rules and regulations.  Section 7(f)(iv) further obligates the acquirer to publish notice of its tender offer "in the business section of the major newspapers . . . in the City of New York, U.S.A. and any other city where the shares [of YPF] shall be listed."  App. 340.  Perhaps most importantly for purposes of this appeal, section 28(A) of the bylaws extends the tender offer requirement of sections 7(e) and 7(f) to:

> all acquisitions made by the [Government of Argentina], whether directly or indirectly, by any means or instrument, of shares or securities of [YPF], 1) if, as a consequence of such acquisition, the [Government] becomes the owner, or exercises the control of, the shares of [YPF], which, in addition to the prior holdings

5

> thereof of any class of shares, represent, in the
> aggregate, at least 49% of the capital stock [of YPF]; or
> 2) if the [Government] acquires at least 8% of class D
> outstanding shares of stock, while withholding class A
> shares of stock amounting at least to 5% of the capital
> stock.

App. 432.

The penalties for breaching these provisions are drastic. Section 7(h) provides that "[s]hares of stock and securities acquired in breach of [the tender offer requirements] shall not grant any right to vote or collect dividends." App. 342. And section 28(C) extends such treatment to shares acquired by Argentina, unless its breach is accidental. In that case, "[t]he penalties provided for in subsection (h) of Section 7 shall be limited . . . to the loss of the right to vote." App. 355. At bottom, these shareholder protection measures appear to promise investors a compensated exit from their ownership position in the firm if Argentina were to decide to renationalize YPF.

Argentina and YPF touted these protections in the prospectus filed with the SEC in connection with the IPO. That document stated that "[u]nder [YPF's] By-laws, in order to acquire a majority of [YPF's] capital stock . . . , the Argentine Government first would be required to make a cash tender offer to all holders of [the shares] on terms and conditions specified in the By-laws." App.

23. The prospectus further stated that "any Control Acquisition carried out by the Argentine Government other than in accordance with th[at] procedure . . . will result in the suspension of the voting, dividend and other distribution rights of the shares so acquired." *Id.* (alteration in original).

By all accounts, Argentina's marketing efforts worked. YPF launched a successful IPO on June 29, 1993. Through the sale of YPF securities, Argentina raised billions of dollars in investment capital with the largest share (more than $1.1 billion in total) coming from the sale of ADRs in the United States on the NYSE. A firm called Repsol S.A. ("Repsol") emerged from the IPO as YPF's majority shareholder. Even after the IPO, however, Argentina continued to participate in YPF's corporate governance as a commercial actor. It remained a holder of YPF's Class A shares, entitling it to elect at least one member of the firm's board of directors. Argentina also retained a veto right over certain third-party acquisitions of YPF's capital stock. After the IPO, YPF's shares, via the ADRs, were traded publicly on the NYSE and other exchanges.

Plaintiffs-appellees Petersen Energía Inversora, S.A.U. and Petersen Energía, S.A.U. (together, "Petersen") entered the picture in 2008. Between 2008 and 2011, Petersen conducted a series of acquisitions and came to own

7

approximately 25% of YPF's shares, held in the form of ADRs issued by the Bank

of New York Mellon in New York City. All of Petersen's acquisitions were made

in accordance with YPF's bylaws, including the tender offer provisions in section

7. The bulk of Petersen's shares were purchased from Repsol and their purchase

was financed by Repsol and various financial institutions, which maintained a

security interest in the stock as collateral. As part of a shareholder agreement

with Petersen, Repsol agreed to cause YPF to make biannual distributions of 90%

of its profits to shareholders via dividends in accordance with section 25 of the

bylaws. Petersen often used these dividends to make payments on the loans it

used to finance the purchase of YPF stock.

All of that changed in 2012. Early that year, members of the

Argentine government began publicly criticizing Repsol's and Petersen's

management of YPF and started discussing the prospect of renationalizing the

company. The value of YPF's ADRs plummeted in response to this news. To put

what happened next in the appropriate context, it helps to understand a little

about the mechanics of Argentine expropriation law.

## II.    Argentine Expropriation Law

Expropriation is the "governmental taking or modification of an individual's property rights." *Expropriation*, BLACK'S LAW DICTIONARY (10th ed. 2014).  A "classic example" is the government's condemnation of a parcel of land to make way for some public good, like a road.  *Murr v. Wisconsin*, 137 S. Ct. 1933, 1939 (2017).  The enactment of land use regulations may also, in some cases, constitute an expropriation.  *See id.*  But these land-based examples understate the breadth of a sovereign's power of expropriation, which can be vast.  That is so because *all* types of property can be expropriated, whether tangible or intangible. Personal property, airspace rights, contract rights, even the shares of a corporation -- at least in theory, a sovereign can expropriate them all.  *See Penn Cent. Transp. Co. v. City of New York*, 438 U.S. 104, 128 (1978) (discussing a "taking" of airspace rights); *accord* August Reinisch, *Expropriation*, *in The Oxford Handbook of International Investment Law* 407, 410 (Peter Muchlinski et al. eds., 2008) ("It is generally asserted that expropriation may affect not only tangible property but also a broad range of intangible assets of economic value to an investor.  Property that may be expropriated by states thus comprises immaterial rights and interests, including in particular contractual rights.").  In reality, however,

9

Case 16-3303, Document 141-1, 07/10/2018, 2341287, Page10 of 39

whether a government may expropriate property, what property is subject to expropriation, and how much the government must compensate the individual it expropriated the property from (if at all) are largely questions of law of the expropriating nation. Leo T. Kissam & Edmond K. Leach, *Sovereign Expropriation of Property and Abrogation of Concession Contracts*, 28 Fordham. L. Rev. 177, 184 (1959) ("States are at liberty to carry out . . . expropriations in the manner and form they consider best; . . . they are free to operate their municipal system of property according to their own national genius . . . ."); *compare* Org. for Econ. Co-operation & Dev., *"Indirect Expropriation" and the "Right to Regulate" in International Investment Law, in International Investment Law: A Changing Landscape* 43, 43-72 (2005) (discussing limits imposed on expropriations by customary international law). In this case, we look to Argentine law. *See Garb v. Republic of Poland*, 440 F.3d 579, 594-98 (2d Cir. 2006).

Article 17 of Argentina's National Constitution sets the conditions under which property may be expropriated by the Argentine government. To effectuate an expropriation consistent with Article 17, two conditions must be met: (1) the Argentine Congress must declare a public use for the property to be expropriated and (2) the owner of the property must be compensated. The

10

Argentine government has passed laws to clarify what property is subject to expropriation and to specify the procedures that must be followed to meet the conditions for expropriation.

One such law is Law 21,499, known as the "General Expropriation Law." App. 57. It empowers, among other entities, the Argentine Federal Government to act as an expropriator. As for the declaration of public use required by Article 17 of the National Constitution, section 5 of the General Expropriation Law clarifies that the Argentine Congress "shall particularly refer to specific property" to be expropriated in its declaration and section 1 provides that "[p]ublic use, which is required as legal grounds for expropriation, comprises all cases where public welfare may be involved." App. 185-86. The law further declares that "[a]ll such property as may be convenient or necessary to satisfy [that] 'public use' purpose, whatever the legal nature thereof, whether publicly or privately owned, or be they things or not, may be subject to expropriation . . . ." App. 186. As for compensation for that property, section 10 of the General Expropriation Law provides that the owner shall receive "the objective value of the property plus any direct and immediate damages resulting from expropriation," such amounts to be fixed by agreement of the owner and

11

expropriator or pursuant to a court proceeding. App. 187. And, presumably to prevent the owner's malfeasance while compensation is being fixed, section 16 of the law proclaims that "[n]o contract executed by the owner after the effective date of the law declaring the expropriation of the property and which may imply the creation of any right or interest in the property shall be good as against the expropriator." App. 187.

Accordingly, with this legal backdrop in mind, we return to how Argentina regained control over YPF's affairs in the spring of 2012.

## III. Argentina Regains Control of YPF

On April 16, 2012, pursuant to the General Expropriation Law, Argentina proposed legislation that would expropriate directly from Repsol 51% of the voting stock of YPF. On the same day, the Argentine National Executive Office decreed that it was empowering an "Intervenor" to seize immediate control of YPF's operations and to operate the company as a going concern while the Argentine Congress considered the expropriation legislation. Action was swift. Indeed, before some of these measures were even announced publicly, the Intervenor seized control of YPF's facilities, replaced top management with government officials, and escorted YPF's then-CEO off the premises. The

12

Intervenor also cancelled regularly-scheduled meetings of YPF's board of directors and refused to make expected dividend payments.

Argentine officials were also quick to declare that, despite having acquired control of the company, Argentina and YPF had no intention of complying with the tender offer provisions of YPF's bylaws. For example, on April 17, 2012, in a speech before the Argentine Senate, the country's Deputy Economy Minister described as "fools . . . those who think that the State has to be stupid and buy everyone according to YPF's own law, respecting its by-law." App. 29 n.1. He also dismissed the tender offer requirements as "unfair" and a "bear trap." *Id*.

On May 3, 2012, the proposed expropriation legislation was enacted as Law 26,741 with an effective date of May 7, 2012 (the "YPF Expropriation Law"). In accordance with Article 17 of the National Constitution, the YPF Expropriation Law pronounced Argentina's national public interest in achieving "self-sufficiency in hydrocarbon[] supply," App. 165, by, *inter alia,* integrating "public and private . . . capital into strategic alliances aimed at the exploration and exploitation of conventional and unconventional hydrocarbons," App. 166. The law further provided that:

13

> to ensure the fulfillment of the objectives of this law, the
> fifty-one percent (51%) equity interest in YPF Sociedad
> Anónima represented by the same percentage of Class
> D shares of the said Company, held by Repsol YPF S.A.,
> its controlled or controlling entities, directly or
> indirectly, is hereby declared to be of public use and
> subject to expropriation.

App. 167. The YPF Expropriation Law also extended the Intervenor's control over the firm's operations and granted the Argentine executive branch the right to "exercise all the political rights over all the shares subject to expropriation" until the expropriation, including compensation of Repsol, was finalized. App. 167.

Argentina did indeed exercise the rights of Repsol's shares, using them to cancel YPF's previously-scheduled dividend payment and board meeting in April 2012, and voted the shares at a shareholder meeting in June 2012, in contravention of section 7(h) of the bylaws. Unable to meet its loan obligations without the dividend payment, Petersen entered insolvency proceedings in July 2012 and its lenders foreclosed on the YPF ADRs that Petersen had pledged as collateral. Repsol was eventually compensated for its expropriated shares to the tune of $4.8 billion.

## IV.  Procedural History

Petersen commenced this action in the district court on April 8, 2015, alleging, *inter alia*, breach of contract on grounds that (1) Argentina repudiated its obligation to make the tender offer in accordance with sections 7(e) and (f) and 28 of the bylaws, (2) YPF breached its obligation to ensure Argentina made such a tender offer in light of its acquisition of Repsol's shares, and (3) YPF permitted Argentina to exercise the voting rights of Repsol's shares and other corporate governance powers in contravention of section 7(h) of the bylaws.  Defendants moved to dismiss the complaint, arguing, *inter alia*, that the district court lacked subject matter jurisdiction under the Foreign Sovereign Immunities Act, 28 U.S.C. § 1601 *et seq.* (the "FSIA"), and that Petersen's claims were barred by the "act of state doctrine."  As is relevant here, the district court denied defendants' motions to dismiss with respect to the FSIA and act of state issues.  They timely appealed the FSIA ruling and the district court subsequently certified the act of state issue for our interlocutory review.

15

*DISCUSSION*

Two issues are presented. First, we consider whether the federal courts have subject matter jurisdiction over this case under the FSIA. Second, we address defendants' arguments based on the act of state doctrine.

**I.      Subject matter jurisdiction under the FSIA**

**A.      Applicable law**

Our jurisdiction over the district court's FSIA ruling is premised on the collateral order doctrine, which "allows an immediate appeal from an order denying immunity under the FSIA." *Kensington Int'l Ltd. v. Itoua*, 505 F.3d 147, 153 (2d Cir. 2007) (citation omitted). We review *de novo* "a district court's legal determinations regarding its subject matter jurisdiction, such as whether sovereign immunity exists," and its factual determinations for clear error. *Filler v. Hanvit Bank*, 378 F.3d 213, 216 (2d Cir. 2004). "In determining whether an exception to the FSIA applies, the district court can and should consider matters outside the pleadings relevant to the issue of jurisdiction," and we do the same on appeal. *Kensington*, 505 F.3d at 153.

The FSIA "provides the sole basis for obtaining jurisdiction over a foreign state in the courts of this country." *Argentine Republic v. Amerada Hess*

*Shipping Corp.*, 488 U.S. 428, 443 (1989). "The Act states that a 'foreign state shall be immune from the jurisdiction of the courts of the United States and of the States except as provided in sections 1605 to 1607.'" *Rogers v. Petroleo Brasileiro, S.A.*, 673 F.3d 131, 136 (2d Cir. 2012) (quoting 28 U.S.C. § 1604). Here, the parties do not dispute that Argentina is a foreign state and YPF is an instrumentality of Argentina and therefore Petersen has "the burden of going forward with evidence showing that, under exceptions to the FSIA, immunity should not be granted." *Kensington*, 505 F.3d at 153 (citation omitted). "Where the plaintiff satisfies [its] burden that an FSIA exception applies, the foreign sovereign then bears the ultimate burden of persuasion that the FSIA exception does not apply." *Swarna v. Al-Awadi*, 622 F.3d 123, 143 (2d Cir. 2010).

The exception relevant here, the commercial activity exception, provides as follows:

> A foreign state shall not be immune from the jurisdiction of courts of the United States . . . in any case . . . in which the action is based [1] upon a commercial activity carried on in the United States by the foreign state; or [2] upon an act performed in the United States in connection with a commercial activity of the foreign state elsewhere; or [3] upon an act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere and that act causes a direct effect in the United States.

17

28 U.S.C. § 1605(a)(2).  As for these conditions "[a] plaintiff need only show that one of [them] is met for the commercial activities exception to apply." *Kensington*, 505 F.3d at 154.

Below, the district court held that Petersen's claims satisfy the third condition, known as the "direct-effect clause."  To establish jurisdiction on that basis, the action must be "(1) based . . . upon an act outside the territory of the United States; (2) that was taken in connection with a commercial activity of Argentina outside this country; and (3) that cause[d] a direct effect in the United States."  *Republic of Argentina v. Weltover, Inc.*, 504 U.S. 607, 611 (1992) (alteration in original) (internal quotation marks omitted).

As to the first element, "we must identify the act of the foreign sovereign State that serves as the basis for plaintiffs' claims."  *Garb*, 440 F.3d at 586.  What matters for this inquiry is that the challenged "action is 'based upon' the 'particular conduct' that constitutes the 'gravamen' of the suit."  *OBB Personenverkehr AG v. Sachs*, 136 S. Ct. 390, 396 (2015).  The Supreme Court has instructed us to "zero[] in on the core of [the plaintiffs'] suit:  the . . . acts that actually injured them."  *Id.*

Case 16-3303, Document 141-1, 07/10/2018, 2341287, Page43 of 39

As to the second element, "the Act defines 'commercial activity' as 'either a regular course of commercial conduct or a particular commercial transaction or act,' and provides that '[t]he commercial character of an activity shall be determined by reference to the nature of the course of conduct or particular transaction or act, rather than by reference to its purpose.'" *Saudi Arabia v. Nelson*, 507 U.S. 349, 358-59 (1993) (quoting 28 U.S.C. § 1603(d)).  A state engages in "commercial activity . . . only where it acts 'in the manner of a private player within' the market" or, put differently, "where it exercises 'only those powers that can also be exercised by private citizens,' as distinct from those 'powers peculiar to sovereigns.'" *Id.* at 360.  For example, "a foreign state's repudiation of a contract is precisely the type of activity in which a private player within the market engages." *De Csepel v. Republic of Hungary*, 714 F.3d 591, 599 (D.C. Cir. 2013) (citation and internal quotation marks omitted).  By contrast, "expropriations . . . do not fall within the 'commercial activity' exception of the FSIA [because] [e]xpropriation is a decidedly sovereign -- rather than commercial -- activity." *Garb*, 440 F.3d at 586.

As to the third element, "a direct effect in the United States," "to be direct, an effect need not be substantial or foreseeable, but rather must simply

19

follow[] as an immediate consequence of the defendant's . . . activity." *Atlantica Holdings, Inc. v. Sovereign Wealth Fund Samruk-Kazyna JSC*, 813 F.3d 98, 108 (2d Cir. 2016) (alteration in original) (internal quotation marks omitted).

## B.  Application

With these principles in mind, we turn to defendants' arguments that this case does not fall within the FSIA's commercial activity exception.  We first consider Argentina's contention that Petersen's claims are in fact based on sovereign acts, rather than commercial ones, and then we address YPF's arguments that it too is entitled to immunity under the FSIA.

### 1.  Argentina

Argentina does not challenge the district court's conclusion that its breach of the bylaws' tender offer requirements caused a direct effect in the United States.  And we agree with that conclusion because those provisions required Argentina to tender for ADRs listed on the NYSE and "courts have consistently held that, in contract cases, a breach of a contractual duty causes a direct effect in the United States sufficient to confer FSIA jurisdiction [if] the United States is the place of performance for the breached duty." *Id.* at 108-09.

Instead, Argentina argues that Petersen's claims are "based on" the sovereign act of expropriation, rather than any commercial activity, thereby rendering the FSIA's commercial activity exception inapplicable. It premises this argument on three claims about the nature of Petersen's lawsuit. First, Argentina asserts that the complaint misinterprets the bylaws, obscuring that the breach Petersen complains of is actually Argentina's sovereign expropriation of Repsol's 51% ownership stake in YPF, rather than the failure to conduct a tender offer. Second, Argentina contends that it could not have complied with both the YPF Expropriation Law and the bylaws' tender offer requirement because the former required Argentina to acquire 51% ownership of YPF and no greater amount. Third, Argentina characterizes Petersen's claims as an impermissible effort to "enforce the bylaws." Argentina Reply Br. 2. We discuss each argument, in turn.

Argentina first contends that the district court erred in accepting Petersen's interpretation that YPF's bylaws permitted Argentina to conduct a tender offer *after* it acquired a controlling interest in YPF. According to Argentina, the bylaws instead required Argentina to acquire its majority ownership position *through* the tender offer process contemplated in the bylaws. Argentina, in this view, breached the bylaws (if at all) by acquiring Repsol's stock

21

through the expropriation instead of a tender offer. So understood, Petersen's lawsuit is not "based on" Argentina's commercial activity; rather, it is based on a decidedly sovereign act, *i.e.*, the expropriation of Repsol's shares. Consequently, Argentina argues that Petersen's lawsuit falls outside of the FSIA's commercial activity exception.

We are not persuaded. Looking, as we must, to "the core of [the plaintiffs'] suit," *i.e.*, "the . . . acts that actually injured them," *OBB Personenverkehr*, 136 S. Ct. at 396, we conclude that Petersen seeks relief for injuries caused by commercial, rather than sovereign, activity.

To start, we agree with the district court that, under the bylaws, Argentina's expropriation triggered an obligation to make a tender offer for the remainder of YPF's outstanding shares. Argentina's contrary interpretation, *i.e.*, that the bylaws required Argentina to conduct a tender offer *in order to acquire* Repsol's 51% stake in YPF (meaning that the expropriation itself was Argentina's breach, rather than its subsequent failure to make a tender offer) rests on a misreading of the bylaws. To recap, section 28(A) of the bylaws provides in its totality that:

> The provisions of subsections e) and f) of Section 7
> (with the sole exception of the provisions of paragraph

22

> B of the said Section) shall apply to all acquisitions
> made by the National Government, whether directly or
> indirectly, by any means or instrument, of shares or
> securities of the Corporation, 1) if, as a consequence of
> such acquisition, the National Government becomes the
> owner [of], or exercises the control of, the shares of the
> Corporation, which, in addition to the prior holdings
> thereof of any class of shares, represent, in the
> aggregate, at least 49% of the capital stock; or 2) if the
> National Government acquires at least 8% of class D
> outstanding shares of stock, while withholding class A
> shares of stock amounting at least to 5% of the capital
> stock provided for in subsection (a) of section 6 of these
> By-laws upon registration thereof with the Public
> Registry of Commerce. Should class A shares represent
> a lower percentage than the one previously mentioned,
> the provisions set forth in point 2) of this Section shall
> not be applicable. Instead, the general criteria set forth
> in subsection d) of Section 7 shall apply.

App. 432. Admittedly, the wording of this bylaw is not a paragon of clarity, a

defect that is no doubt exacerbated by the provision's translation into English

from the Spanish language original. But we can divine its meaning if, for the

sake of simplicity, we unpack some of the cross references and omit certain

clauses that do not apply to this case. Recall, for example, that the tender offer

requirements are found in "[t]he provisions of subsections e) and f) of Section 7,"

App. 432, and that we are concerned only with Argentina's expropriation of

Repsol's 51% ownership stake. With these facts in mind, section 28(A) can be

fairly rephrased as follows:

> The [obligation to make a tender offer] shall apply to [Argentina's acquisition of YPF's shares] . . . by any means or instrument . . . if, as a consequence of such acquisition, [Argentina] becomes the owner [of], or exercises the control of, . . . at least 49% of the capital stock [of YPF] . . . .

App. 432. Simply put, section 28(A) compels Argentina to make a tender offer in accordance with the procedures set forth in the bylaws if "by *any means* or instrument" it "becomes the owner [of], or exercises the control of," at least 49% of YPF's capital stock. App. 432 (emphasis added).

This interpretation is bolstered by the language of section 7(d), which determines whether acquirers *other than Argentina* must make a tender offer. That bylaw provides that "[i]f the terms of subsections e) and f) of this section are not complied with, *it shall be forbidden to acquire shares or securities of the Corporation* . . . if, as a result of such acquisition, the purchaser becomes the holder of," *inter alia*, "[15%] or more of the capital stock." App. 338 (emphasis added). As the italicized language demonstrates, when the drafters of the bylaws, namely, YPF and Argentina, wanted to ensure that certain acquisitions would proceed only *through* a tender offer process, they used language that flatly forbade non-conforming acquisitions. By contrast, the absence of any similar prohibitory language in section 28(A) suggests that Argentina's acquisition of a

24

control position is different in that it merely triggers a separate obligation to make a tender offer. In other words, in contrast to a hostile takeover by a private actor, Argentina's acquisition of a control position, as such, did not have to be accomplished *through* the tender offer.

Under this reading of the contract, we conclude that Petersen's lawsuit is "based on" Argentina's breach of a commercial obligation. The gravamen of Petersen's claim is that Argentina denied Petersen the benefit of the bargain promised by YPF's bylaws when Argentina repudiated its obligation to tender for Petersen's shares. As the district court noted, when Argentina expropriated Repsol's 51% stake in YPF, it incurred the obligation under section 28(A) of YPF's bylaws to make a tender offer for the remainder of YPF's outstanding shares. That obligation and Argentina's subsequent repudiation of it were indisputably commercial in nature in that they are "the *type* of actions by which a private party engages in trade and traffic or commerce." *Weltover*, 504 U.S. at 614 (citation and internal quotation marks omitted); *accord De Csepel*, 714 F.3d at 599 ("[A] foreign state's repudiation of a contract is precisely the type of activity in which a private player within the market engages." (citation and internal quotation marks omitted)). Indeed, as noted above, the bylaws impose

25

similar obligations on others who seek to acquire large ownership stakes in YPF, and the record shows that those commercial actors, including Petersen, conducted tender offers when so required. Although Argentina's obligation to conduct a tender offer in this case was triggered by its sovereign act of expropriation, *see Garb*, 440 F.3d at 586 ("Expropriation is a decidedly sovereign -- rather than commercial -- activity."), there is nothing unusual about conditioning a commercial obligation on the occurrence of a sovereign act, even when the sovereign itself is one of the parties to the contract, *see, e.g.*, *Guevara v. Republic of Peru*, 468 F.3d 1289, 1300 (11th Cir. 2006) (discussing a hypothetical contract wherein a sovereign conditioned its payment on a contract "to buy bullets from a private manufacturer . . . on it declaring war on a neighbor before the scheduled date of delivery" and concluding that "[t]he condition precedent of a declaration of war . . . does not change the commercial nature of the acts of purchasing and paying" for the bullets); Restatement (Second) of Contracts § 264, ill. 3. Moreover, as the district court correctly observed, "[t]he commercial contractual obligations at issue here could just as easily have been triggered by Argentina's acquisition of a controlling stake in YPF in open-market transactions." S. App.

17. Accordingly, for these reasons, we conclude that Argentina's breach of those obligations was a commercial act, not a sovereign one.

We turn next to Argentina's contentions that (1) it could not have complied with both the bylaws and the YPF Expropriation Law at the time of its breach and (2) Petersen's lawsuit is an *ex post facto* attempt to "enforce the bylaws." Argentina Reply Br. 2. Both arguments fail.

As to the first argument, we see no reason why Argentina could not have complied with both the bylaws' tender offer requirements and the YPF Expropriation Law. In support of its argument to the contrary, Argentina relies on the declaration of an expert witness who opines that "the YPF Bylaws cannot validly restrict, limit, or in any way affect the exercise of sovereign powers of the National Government in general and regarding expropriations in particular." App. 214. Because its expropriation powers trump the bylaws and "requiring any post-expropriation tender for the remaining YPF shares would be inconsistent with the [YPF] Expropriation Law's requirement that Argentina acquire *exactly* 51% ownership in YPF," Argentina Br. 39, Argentina contends that it could not have complied with both obligations and thus the YPF Expropriation Law prevails. Finally, Argentina avers that, pursuant to our opinion in *In re*

*Vitamin C Antitrust Litigation*, 837 F.3d 175 (2d Cir. 2016), we must defer to its expert's interpretation of Argentine law.  Again, we are not persuaded.

Starting with the latter argument, *In re Vitamin C Antitrust Litigation* has now been reversed by the Supreme Court, in *Animal Science Products, Inc. v. Hebei Welcome Pharmaceutical Co.*, 138 S. Ct. 1865 (2018).  The Supreme Court in *Animal Science* rejected our ruling in *Vitamin C* that federal courts are "bound to defer" to a foreign government's construction of its own law, 837 F.3d at 189, and instead held that "[a] federal court should accord respectful consideration to a foreign government's submission, but is not bound to accord conclusive effect to the foreign government's statements."  *Animal Sciences*, 138 S. Ct. at 1869.

Here, even according respectful consideration to Argentina's views, we do not find that the expert's interpretation supports Argentina's argument that "any post-expropriation tender for the remaining YPF shares would be inconsistent with the [YPF] Expropriation Law's requirement that Argentina acquire *exactly* 51% ownership in YPF."  Argentina Br. 39.  In particular, there is no provision in the YPF Expropriation Law itself and no statement in the expert's opinion that the law compelled Argentina to "acquire *exactly* 51% ownership in YPF" and no greater ownership position.  Argentina Br. 39 (emphasis in original).

28

To the contrary, as noted above, the YPF Expropriation Law declares only that to ensure "self-sufficiency in hydrocarbon[] supply," App. 165, and to integrate "public and private . . . capital into strategic alliances aimed at the exploration and exploitation of conventional and unconventional hydrocarbons," App. 166, "the fifty-one percent (51%) equity interest in YPF Sociedad Anónima represented by the same percentage of Class D shares of the said Company, held by Repsol YPF S.A., its controlled or controlling entities, directly or indirectly, is hereby declared to be of public use and subject to expropriation," App. 167. The law further provides that YPF shall remain a publicly-traded company after the expropriation and "shall not be subject to any legislation or regulation applicable to the administration, management and control of companies or entities partly owned by the national or provincial governments" of Argentina, confirming that YPF would continue its normal commercial activities after the expropriation. App. 169. At bottom, the YPF Expropriation Law does not prohibit a post-expropriation tender offer under YPF's bylaws; indeed, it says absolutely nothing about Argentina's acquisition of additional YPF shares in a subsequent market transaction.

29

Similarly, Argentina's expert opines only that (1) Argentina's sovereign power of expropriation cannot be limited by private agreement, (2) "the expropriation of YPF shares for reasons of public use . . . prevails over clauses in . . . a private corporate agreement" such as the bylaws, and (3) "in [his] opinion, [he did] not perceive, in the process of intervention of YPF or in the temporary occupation and subsequent expropriation of shares, that there was any violation of constitutional or legal norms under Argentine law."  App. 218. Again, none of these opinions support the proposition that Argentina was required by law to acquire exactly 51% of YPF, no more and no less. Accordingly, even if we were to accord deference to Argentina's legal expert pursuant to *In re Vitamin C Antitrust Litigation*, we conclude that his opinion does not establish what Argentina says it does.  Although we are mindful of the deference we owe to foreign sovereigns as to the construction of their laws, we simply see no basis in the record for concluding that Argentina could not have complied with both the YPF Expropriation Law and the bylaws' tender offer requirements by launching a post-expropriation tender offer.

As to Argentina's last argument on the FSIA issue, it is unclear what Argentina means when it characterizes Petersen's lawsuit as an attempt to

30

"enforce the bylaws." Argentina Reply Br. 2. To the extent that Argentina is suggesting that Petersen wants a court to order Argentina to conduct a tender offer now, such argument is baseless. Petersen's complaint does not seek a specific performance remedy. Nor could it for Petersen is no longer a YPF shareholder and therefore could not perform its obligation to tender shares in the event of a court-ordered tender offer. Restatement (Second) Contracts § 363, cmts. a & b (plaintiff's ability to perform its obligations under the contract is a prerequisite to a specific performance remedy). Rather, Petersen merely seeks compensatory damages for Argentina's breach of its tender offer obligation in 2012. The award of such damages would no more "enforce the bylaws" than an award of damages in any breach of contract case would enforce the contract forming the basis of the plaintiff's suit.

In sum, we conclude that when Argentina asserted control over Repsol's 51% stake in YPF via expropriation, it incurred a separate commercial obligation under the bylaws to make a tender offer for the remainder of YPF's outstanding shares. Because Petersen claims it was injured by Argentina's repudiation of that commercial obligation and we conclude that the repudiation was an act separate and apart from Argentina's expropriation of Repsol's shares,

31

we hold that Petersen's action against Argentina falls within the "direct-effects"

clause" of the FSIA.

### 2.     YPF

As a threshold matter, we note that although YPF became an

instrumentality of Argentina by virtue of the expropriation of Repsol's shares, *see*

28 U.S.C. § 1603(b)(2) (an "instrumentality of a foreign state" is, *inter alia*, "any

entity . . . a majority of whose shares or other ownership interest is owned by a

foreign state"), that fact does not render all of its subsequent conduct "sovereign,"

rather than "commercial," in nature. *See Gemini Shipping, Inc. v. Foreign Trade Org.*

*for Chems. & Foodstuffs*, 647 F.2d 317, 318-20 (2d Cir. 1981) (noting that a foreign

instrumentality can engage in commercial activity sufficient to bring such

conduct within FSIA's commercial activity exception).  Instead, the inquiry

remains whether YPF "act[ed] in the manner of a private player within the

market," or whether "it exercise[d] . . . powers peculiar to sovereigns." *Nelson*, 507

U.S. at 360 (citations and internal quotation marks omitted).

YPF raises two objections to maintaining subject matter jurisdiction

over this case under the FSIA.  First, it argues that the gravamen of Petersen's

claims against it is its alleged failure to stop Argentina from voting Repsol's

32

expropriated shares and that such act was in compliance with Argentina's sovereign expropriation and thus not a commercial activity. Second, YPF contends that its failure to stop Argentina from exercising corporate governance powers conferred by Repsol's shares had no direct effect in the United States.

Petersen responds, correctly in our view, that YPF's arguments ignore that Petersen alleges two separate breaches of YPF's bylaws. The complaint alleges that YPF breached the bylaws by (1) failing to enforce the bylaws' tender offer provisions vis-à-vis Argentina and (2) failing to enforce the penalties that section 7(h) imposes on shareholders who have breached their tender offer obligations. As for Petersen's first theory of the case, we conclude that the claim against YPF falls within the "direct-effect clause" of FSIA's commercial activity exception for the same reasons that the analogous claim against Argentina does. That is, YPF's obligation to enforce the tender offer provision triggered by Argentina's expropriation of Repsol's 51% ownership stake is commercial in nature -- indeed, every corporation is obligated to abide by its bylaws, *see, e.g.*, *Boilermakers Local 154 Ret. Fund v. Chevron Corp.*, 73 A.3d 934, 938-40 (Del. Ch. 2013) -- and YPF's failure to do so caused a direct effect in the United States, namely, the required tender for ADRs listed on the NYSE

33

never took place. *See Atlantica Holdings*, 813 F.3d at 108-09 ("[C]ourts have consistently held that, in contract cases, a breach of a contractual duty causes a direct effect in the United States sufficient to confer FSIA jurisdiction [if] the United States is the place of performance for the breached duty.").

As for Petersen's second theory of liability, we conclude that YPF's failure to enforce the penalties imposed by section 7(h) is of a piece with its failure to enforce the tender offer provisions. Like those latter provisions, section 7(h) implicates the commercial affairs of YPF, *i.e.*, what voting rights attach to which shares and which shares are entitled to collect dividends, and thus its enforcement or non-enforcement constitutes commercial activity. To be sure, the YPF Expropriation Law granted Argentina the right to exercise the voting rights associated with Respsol's shares, but YPF has not explained how that fact transforms its own failure to enforce the bylaws into an exercise of "powers peculiar to sovereigns." *Nelson*, 507 U.S. at 360. What is more, as noted, the YPF Expropriation Law explicitly stated that the firm would remain a publicly-traded company, subject to laws applicable to private, rather than government-owned companies. This fact cuts against YPF's contention that it was somehow acting as a sovereign. Furthermore, YPF's refusal to enforce section 7(h)'s penalties had a

34

direct effect in the United States because (1) it enabled Argentina to cancel planned dividend payments, some of which would have been made to investors based in the United States, and (2) it precipitated Petersen's default on its loan obligations and the subsequent foreclosure of Petersen's ADRs, which were held by the Bank of New York Mellon in New York City.

Accordingly, we conclude that Petersen's claims against YPF also fall within the "direct-effect clause" of the FSIA's commercial activity exception.

\* \* \*

The thrust of defendants' arguments on appeal is that Petersen has engaged in a form of artful pleading that we have previously rejected. They contend that Petersen has re-characterized Argentina's expropriation of Repsol's shares as a commercial act, rather than a sovereign one, so as to trigger application of the FSIA's commercial activity exception. *See Garb*, 440 F.3d at 588 ("Federal courts have repeatedly rejected litigants' attempts to establish subject matter jurisdiction pursuant to . . . FSIA exceptions when their claims are in essence based on disputed takings of property."). Based on our review of the complaint and the record before us, however, we are satisfied that Petersen is not challenging the expropriation.

35

Case 16-3303, Document 141-1, 07/10/2018, 2341287, Page36 of 39

As noted above, Argentina's expropriation powers are vast. Indeed, it could have expropriated the entirety of YPF, some smaller portion of the firm such as the 25% stake owned by Petersen, or even just the contractual rights of shareholders to receive tender offers in accordance with the bylaws. Of course, had Argentina done any of these things, it would have been obligated by its own law to compensate Petersen for "the objective value of the property" it expropriated, "plus any direct and immediate damages resulting from expropriation." App. 187. And we agree that a lawsuit based on such expropriations would fall outside of the FSIA's commercial activity exception.

Argentina, however, did not expropriate anything from Petersen. To be sure, it did expropriate Repsol's 51% stake in YPF. But, Petersen does not challenge that, or any other sovereign act. Instead, Petersen wants a court to award it the benefit of the bargain that Argentina and YPF struck with each shareholder who purchased YPF shares on the open market. Petersen claims that defendants repudiated that bargain when they refused to conduct a tender offer in accordance with YPF's bylaws, despite having incurred the obligation to do so by virtue of Argentina's acquisition of a controlling stake in the firm. The "gravamen" of Petersen's lawsuit is thus the defendants' repudiation of a contract

36

that had a direct effect in the United States. *OBB Personenverkehr*, 136 S. Ct. at

396. Sovereigns are not immune from such lawsuits under the FSIA. *See*

*Weltover*, 504 U.S. at 614-15.

## II.    The Act of State Doctrine

As noted, we have appellate jurisdiction over the issue of the

defendants' immunity from suit under the FSIA under the collateral order

doctrine, pursuant to which the district court's order denying such immunity

was immediately appealable. *See Atlantica Holdings*, 813 F.3d at 105. By contrast,

the district court's denial of defendants' motions to dismiss under the act of state

doctrine, which were brought pursuant to Federal Rule of Civil Procedure

12(b)(6), is not immediately appealable. *See Will v. Hallock*, 546 U.S. 345, 351

(2006); *see also Balintulo v. Daimler AG*, 727 F.3d 174, 186 (2d Cir. 2013) ("As a

general matter, denials of a motion to dismiss are not appealable as 'final

decisions' of the district courts under 28 U.S.C. § 1291.").

Interlocutory orders that are otherwise non-appealable, however,

may be reviewed under 28 U.S.C. § 1292(b) if the district court is "of the opinion

that [the relevant] order involves a controlling question of law as to which there

is substantial ground for difference of opinion and that an immediate appeal

from the order may materially advance the ultimate termination of the

litigation."  28 U.S.C. § 1292(b); *see McDonnell Douglas Fin. Corp. v. Penn. Power &*

*Light Co.*, 849 F.2d 761, 764 (2d Cir. 1988).  If, as here, the district court certifies an

appeal, the Court of Appeals may then, "in its discretion, permit an appeal to be

taken from such order."  28 U.S.C. § 1292(b).

We exercise our discretion not to accept jurisdiction over this aspect

of the appeal.  The act of state doctrine provides an affirmative defense and was

raised below on a motion to dismiss pursuant to Rule 12(b)(6).  Dismissal was

warranted only if the doctrine's applicability was "shown on the face of the

complaint."  *Konowaloff v. Metro. Museum of Art*, 702 F.3d 140, 146 (2d Cir. 2012);

*accord Daventree Ltd. v. Republic of Azerbaijan*, 349 F. Supp. 2d 736, 755 (S.D.N.Y.

2004) ("As a substantive rather than a jurisdictional defense, the Act of State

doctrine is more appropriately raised in a motion for summary judgment than in

a motion to dismiss.").  As discussed above, the face of Petersen's complaint

makes clear that it is not challenging Argentina's official acts -- the expropriation

of property -- and the complaint's allegations that Argentina and YPF breached

their obligations by failing to engage in a tender offer did not require the district

court to rule on the validity of any of Argentina's official acts.  At this juncture of

38

the proceedings, the act of state doctrine does not present the kind of legal question that normally constitutes a "controlling question of law." Whether the act of state doctrine bars Petersen's claims is a merits determination that turns on the facts. In these circumstances, we decline to reach the issue. Accordingly, we dismiss the portion of this appeal challenging the district court's ruling on the defendants' act of state defense.

## *CONCLUSION*

For the foregoing reasons, we **AFFIRM** the district court's order holding that Argentina and YPF are not immune from suit under the FSIA and **DISMISS** the portion of this appeal challenging the district court's ruling on the defendants' act of state defense.

WINTER, *Circuit Judge*, concurring in part and dissenting in part:

I agree entirely with the excellent discussion and ruling as to whether FSIA immunizes Argentina and YPF. I dissent from the disposition of the act-of-state issue.

Having rejected the Section 1292(b) motion that we hear an interlocutory appeal -- otherwise non-appealable -- from the district court's rejection on the pleadings of the act-of-state defense, my colleagues' opinion is quite clear that we lack jurisdiction over the act-of-state issue. It is less clear in stating that the reason for rejecting the motion is that the issue depends on "facts." The district court ruled that the facts alleged in the complaint stated a claim that was not subject to the act-of-state defense. My colleagues' conclusion that fact-finding is needed to rule on the issue is a merits decision going to the nature and contours of the act-of-state defense. Such a conclusion seems, therefore, inconsistent with the ruling that we lack jurisdiction over the issue. Because the reasons we give for rejecting FSIA immunity are that the harm to plaintiffs was not caused by a sovereign, rather than commercial, act of the Argentinian state, that portion of the opinion's reasoning also calls for a rejection of the act-of-state defense to the claim as alleged.

A brief review of the relevant procedural history is in order.  The

defendants moved to dismiss the complaint on the basis that the district court

lacked subject matter jurisdiction under the FSIA and that Petersen's claims were

barred by the act-of-state doctrine.  The district court denied the defendants'

motion on both fronts.  The first issue -- FSIA immunity -- was immediately

appealable under the collateral order doctrine.  *Kensington Int'l Ltd. v. Itoua*, 505

F.3d 147, 153 (2d Cir. 2007).  The rejection of the act-of-state defense was

interlocutory and not immediately appealable.  The district court, believing the

conditions of Section 1292(b) had been met, certified the appeal so that we could

decide both issues in tandem.  Argentina and YPF then moved this court to grant

leave for immediate appeal of the act-of-state issue.  2d Cir. Dkt. Nos. 16-3510,

16-3512.  No opposition was filed to these motions.  The motions were referred to

a motions panel, which then referred them to the merits panel –- this panel –- so

that "[t]hat panel can decide, in the first instance, whether the act-of-state issue is

appropriate for immediate appeal pursuant to . . . § 1292(b)."  Motion Order, 2d

Cir. Dkt. No. 16-3510 (Feb. 14, 2017).

Pursuant to 28 U.S.C. § 1292(b), we have discretion to allow an

appeal to be taken from an order not otherwise appealable when the district

2

judge states in writing "that such order [1] involves a controlling question of law [2] as to which there is substantial ground for difference of opinion and [3] that an immediate appeal from the order may materially advance the ultimate termination of the litigation." (brackets added).  In my view, the established standards under Section 1292(b) are satisfied.

First, a controlling question of law is present.  Reversing the district court's holding that the act-of-state doctrine "does not preclude inquiry into contractual obligations related to or arising out of [acts of expropriation]," would result in dismissal of the case.  *See Klinghoffer v. S.N.C. Achille Lauro*, 921 F.2d 21, 24 (2d Cir. 1990) ("[I]t is clear that a question of law is 'controlling' if reversal of the district court's order would terminate the action."); *In re Duplan Corp.*, 591 F.2d 139, 148 n.11 (2d Cir. 1978).

Second, there is substantial ground for difference of opinion; in particular, whether Argentina's obligation under the bylaws to make a tender offer was independent of Argentina's sovereign acts of intervention and expropriation.

Finally, an immediate appeal would materially advance the ultimate termination of the case.  Judicial efficiency would be served by deciding both this

3

issue and the FSIA question simultaneously. My colleagues' conclusion as to the lack of immunity under FSIA is that the facts alleged in the complaint do not state a claim that implicates a sovereign, rather than commercial, act of the Argentinian state. This conclusion resolves both the FSIA issue and the act-of-state defense. Only a paragraph, if that, would be necessary to explain an affirmance of the certified appeal if we took jurisdiction. We need say only that assertion of an act-of-state defense requires that a sovereign, rather than commercial, act has caused the harm to the plaintiffs, and no such act occurred here.

Instead, my colleagues deny the motion, hold that we lack appellate jurisdiction, and explain these rulings on the grounds that unspecified "facts" are needed to adjudicate the act-of-state defense. While the reason given suggests a remand for further proceedings, my colleagues' jurisdictional ruling leaves the dismissal of the act-of-state defense in place and governed by the law of the case doctrine in the district court. *See Am. Hotel Int'l Grp., Inc. v. OneBeacon Ins. Co.*, 611 F. Supp. 2d 373, 378-79 (S.D.N.Y. 2009) *aff'd*, 374 F. App'x 71 (2d Cir. 2010).

4

Case 16-3303, Document 142, 07/10/2018, 2341289, Page5 of 5

I therefore concur in the affirmance on the FSIA issue. I dissent from

the denial of the Section 1292(b) motion and would affirm the dismissal of the

act-of-state defense to the claim alleged in the complaint.